IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


| | | |
|---|---|---|
| ROBERT U. SYME, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civ. A. No. 03-1033-KAJ |
| | ) | Cr. A. No. 98-32-KAJ |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |


**MEMORANDUM OPINION**

——————————————————

Robert U. Syme. *Pro se* Petitioner.

Beth Moskow-Schnoll, Esq., Assistant United States Attorney, United States Department of Justice, Wilmington, Delaware.  Attorney for Respondent.

——————————————————

October 31, 2006
Wilmington, Delaware



**JORDAN, District Judge**

## I.   INTRODUCTION

Petitioner Robert U.Syme, ("Syme") filed a *pro se* motion to vacate, set aside, or

correct sentence pursuant to 28 U.S.C. § 2255. (D.I. 166.)  The Government has filed

its answer.  (D.I. 174.)  For the reasons discussed, I will deny Syme's § 2255 motion

without holding an evidentiary hearing.

## II.   PROCEDURAL AND FACTUAL BACKGROUND

As reported by the United States Court of Appeals for the Third Circuit Court of

Appeals in Syme's direct appeal, the facts of Syme's case are as follows:

> From 1987 through late 1996, Syme owned and operated an ambulance
> company called Medical Services Corps, Inc. ("MSC"), which had its main office
> first in Stanton, Delaware, and after 1995, in Wilmington, Delaware.  Syme
> created three corporate subsidiaries to MSC.  In 1989, he founded NCC
> Transportation, Inc. ("NCC") and Elk Transportation, Inc. ("Elk").  In 1992 he
> created Independence EMS, Inc. ("Independence").  All three subsidiaries
> operated from MSC's Delaware offices and engaged in the business of providing
> ambulance transportation services.  Ambulances from Syme's companies
> sometimes also operated in Pennsylvania, New Jersey, and Maryland.  Syme
> exercised day-to-day control over MSC and all of its subsidiaries, including
> oversight of the ambulance dispatch and billing operations.  One of the
> mainstays of Syme's ambulance businesses was transporting patients to and
> from regularly scheduled medical treatments.  For example, his companies had
> contracts with the Delaware State Hospital to transport patients to the hospital for
> treatment.
>
> The majority of the patients that Syme's companies transported were covered
> either by Medicare, the federally funded program that funds medical services for
> the elderly, or by Medicaid, a similar program that funds services for low-income
> people.  The Health Care Financing Administration ("HCFA"), is responsible for
> coordinating and financing the reimbursement of health care service providers
> under the Medicare and Medicaid programs.  During the period relevant to this
> case, HCFA contracted first with Pennsylvania Blue Shield and later with its
> subsidiary, Xact Medicare Services ("Xact"), to administer the reimbursement of
> Medicare claims.  Xact was responsible for claims arising in Pennsylvania, New

1

Jersey, and Delaware, and processed the claims for Medicare reimbursement submitted by Syme's ambulance companies.

Xact developed operational guidelines governing which claims would be reimbursed under Medicare consistent with HCFA policy memoranda.  In order to get paid for transporting Medicare patients, ambulance companies were required to submit standard reimbursement requests to Xact with information about the patient, the purpose of the trip, and the starting point and destination. Xact would determine whether to reimburse an ambulance service for a trip depending on whether the trip met certain criteria.  First, the ambulance trip had to be "medically necessary" as defined by Xact's guidelines.  Second, the patient had to be transported for a treatment covered by Medicare's ambulance reimbursement guidelines.  Third, the ambulance trip had to be to a covered destination.  Certain destinations, such as hospitals, were covered by Xact's reimbursement program, while others, such as dental offices, were not.

Ambulance services were also required to record on their reimbursement forms a provider number that indicated the state in which their service was located.  Most importantly, the rate of reimbursement that Medicare paid varied widely according to which state provider number the ambulance service used.  The reimbursement rates for Pennsylvania ambulance services, for example, were almost twice as high as the rates for Delaware services.

Syme and his companies have long had a rocky relationship with HCFA and its subcontractors.  In February 1982, Xact's predecessor, Pennsylvania Blue Shield, became concerned that Delaware Medical Services, Inc. ("DMS"), a separate company that Syme had formed around the same time as MSC, was filing duplicate claims for the same ambulance trip and billing at the higher Pennsylvania rate rather than at the Delaware rate.  According to an affidavit by an employee in the HHS office of the Inspector General, representatives from Pennsylvania Blue Shield spoke with Syme "in an attempt to educate [him] in the appropriate claim filing policies and procedures."  Syme represented in this meeting that "he was inadequately reimbursed for ambulance service in Delaware."

In 1987, the Government filed a civil suit against Syme and DMS, alleging, among other things, that DMS had falsely filed claims for Delaware ambulance trips using a Pennsylvania provider number in order to get reimbursed at the higher Pennsylvania rate.  Syme settled the suit for $4,000 in May 1992, but did not admit any wrongdoing.

In April 1992, Donald Baxter, a Pennsylvania Blue Shield investigator, started looking into the location of MSC's three subsidiary companies.  He visited the locations in Philadelphia that Syme had listed as the addresses for his three companies in the applications that he had submitted for Medicare provider

numbers.  At 4700 Cedar Avenue, the address listed on NCC's provider number application, Baxter found neither a garage, nor ambulances, but rather an apartment building.  He also attempted to visit 3255 A Street, the address listed on Elk's provider number application, but found that the address did not exist.  Finally, Baxter visited 3300 Fairmount Avenue, the address listed on Independence's application.  At that address, he found a number of garages that appeared to be vacant.

Baxter then contacted Syme to ask him where his companies' ambulances were located.  Syme told him that two ambulances were housed at 3300 Fairmount Avenue at the time, but that no ambulances were housed at 3255 A Street.  In a follow-up letter to Baxter, Syme wrote that Elk and NCC had moved from 3225 A Street to 3300 Fairmount Avenue about one year earlier, and that all of the administrative offices and dispatching operations for all three of the subsidiaries had been moved to Stanton, Delaware.  On April 13, 1992, after receiving the letter from Syme, Baxter returned to 3300 Fairmount Avenue.  He visited the site twice, once at 12:30 a.m., and again from 4:25 p.m. until approximately 4:45 p.m., but saw no activity either time.  Before leaving the site, Baxter taped the garage doors so that he could tell if anyone opened them while he was away.  When he returned three days later, the tape had not been disturbed.

Baxter returned to 3300 Fairmount Avenue in July 1994 along with Klaus Placke, an investigator from Xact, and found that the garages and attached office space appeared to be empty.  Following their visit to 3300 Fairmount Avenue, the investigators went to see Syme at his office in Stanton, Delaware.  They asked him where the ambulances for NCC and Elk were located, and he replied that they were still housed at 3300 Fairmount Avenue.  When the investigators told him that they had just been to the location and that it had looked empty, Syme replied that he had moved most of his operation to Delaware, but that he still housed one of NCC's ambulances at the Fairmount Avenue location.  He added that NCC's one Philadelphia-based ambulance was then in Delaware for servicing and he showed it to the investigators.  The investigators asked Syme why the supposedly Philadelphia-based ambulance had Maryland tags and a Maryland certification sticker, but he could not explain the discrepancy.

During the same visit, the investigators asked to see NCC and Elk's state licenses to operate ambulance services in Pennsylvania.  Syme was unable to find the licenses, but asked the investigators to return the next day so that he could give them copies.  When the investigators returned the next day, Syme told them that he had been mistaken, and that NCC and Elk were not licensed in Pennsylvania and consequently had no ambulances in Philadelphia.  He said that Independence was licensed in Pennsylvania and operated one ambulance out of 3300 Fairmount Avenue.  Following the visit, Placke, the Xact investigator, changed NCC and Elk's provider numbers to indicate that the two companies were Delaware providers that could be reimbursed only at the Delaware rate.  He

3

left Indepndence's provider number unchanged, and Independence continued to bill at the Pennsylvania rate.

The Pennsylvania state ambulance licensing authority was also investigating Syme's Philadelphia operations during the early - to mid-1990s.  Independence originally received an ambulance license from Pennsylvania in 1992.  In September 1993, however, Michael Tunney of the Philadelphia region of Pennsylvania's ambulance licensing authority, prompted by a call from his supervisor at the state licensing board, inspected Syme's purported 3300 Fairmount Avenue location.  Tunney saw no employees and no activity at the location.  He knocked on a door located next to the garages, but received no response.

Tunney also received applications signed by Syme for Pennsylvania ambulance licenses for NCC and Elk in September 1993.  Each application listed 3300 Fairmount Avenue as a location out of which the company operated.  Because he had visited the Philadelphia address only a few weeks earlier and found no activity, Tunney called Syme to inquire about the location that he had listed. Syme told him that there was not much activity at 3300 Fairmount Avenue. Tunney did not process the applications for NCC and Elk because, following his conversation with Syme, he had "a question in [his] mind about the veracity of the information in the application . . . as to whether or not [Syme] was really operating in Philadelphia."

Tunney visited the 3300 Fairmount Avenue location again soon after February 1995, after receiving Independence's application for relicensing, which Pennsylvania requires ambulance companies to submit every three years.  He found that the building located at that address appeared to be empty and received no response when he knocked.  Tunney therefore denied Independence's application for relicensing.

On March 10, 1998, a grand jury in the District of Delaware returned a 30-count indictment against Syme and his corporations, MSC, NCC, Elk, and Independence.  The grand jury later returned a 31-count superseding indictment against the same defendants for offenses that allegedly occurred between October 1993 and March 1997.  Our references hereafter are to the superseding indictment.  Syme was charged in all counts of the indictment.  Counts 1-4 allege mail fraud in violation of 18 U.S.C. § 1341. [Counts 5-9 allege wire fraud in violation of 18 U.S.C. § 1343.] The indictment alleges that for each count in [these] groups, Syme engaged in a "scheme to defraud" the HCFA in at least two of the following ways: (1) by falsely identifying a Pennsylvania address for his companies and fraudulently seeking reimbursement at the higher Pennsylvania rate when the claims should have been billed at the Delaware or Maryland rates (the "Pennsylvania rate theory"); (2) by falsely representing that ambulance transport was medically necessary (the "medical necessity theory"); (3) by

4

providing false information about the destination of the ambulance trip (the "destination theory"); and (4) by providing false information about the type of treatment that the patient being transported was receiving (the "treatment theory").

*       *       *       *       *       *

Counts 10-29 allege violations of the False Claims Act, 18 U.S.C. § 287. The indictment divides these counts into three groups. Counts 10-12 apply to the Medicare payments that the defendants are alleged to have received fraudulently. Counts 13-17 apply to the reimbursement and copayments from Medicaid that the defendants are alleged to have fraudulently received. Counts 10-17 rely on all four theories of fraud: the Pennsylvania rate theory, the medical necessity theory, the destination theory, and the treatment theory. Counts 18-29 allege that Syme and his companies violated the False Claims Act by submitting duplicate bills for the same ambulance trip. In addition to the duplicate billing theory, each count in the 18-29 group also alleges one or more of the four fraud theories described above.

Count 30 alleges that Syme obstructed justice in violation of 18 U.S.C. § 1505 by failing to respond properly to a subpoena *duces tecum* issued by the Office of the Inspector General of the Department of Health and Human Services. Count 31 alleges that Syme made a false statement relating to a health care matter in violation of 18 U.S.C. § 1035 when he prepared a letter concerning the application for a provider number by Lifestar Ambulance Services, the renamed company that he had sold to one of the former managers of MSC, in which he falsely stated that "Mr. Robert Syme has no role whatsoever in Lifestar," when in fact he remained active in managing the company.

*United States v. Syme*, 276 F.3d 131, 137-39 (3d Cir. 2002).

On November 5, 1998, following a seven day jury trial before the Honorable Joseph J. Farnan, Jr., the corporate defendants were convicted of all thirty counts with which they had been charged.[1]  The jury convicted Syme of all the mail and wire fraud counts (Counts 1 through 9), fifteen of the twenty false claim counts (Counts 10 through 17, 19, 21, 23 through 25, 27, and 29), and the false statement count (Count 31). The jury acquitted Syme on several of the False Claim Act counts (Counts 18, 20, 22, 26,

_____

[1]This case was re-assigned to the undersigned on March 3, 2004.  (D.I. 173.)

5

and 28), and on the obstruction of justice count (Count 30).   After trial, all the

defendants moved for a new trial and for judgment of acquittal.   Judge Farnan denied

those motions in an opinion dated March 18, 1999.   *United States v. Syme*, 43 F. Supp.

2d 499, 500 (D. Del. 1999), *affirmed in part, vacated in part, by United States v. Syme*,

276 F.3d 131 (3d Cir. 2002).   Syme was sentenced to 37 months imprisonment on each

count, to be served concurrently, followed by three years of supervised release.   He

was also ordered to pay special assessments totaling $1,750 and restitution to the

HCFA in the amount of $100,000 (a $300,000 restitution order less a credit of

$200,000).   The corporate defendants were sentenced to monetary penalties.

Syme appealed, asserting the following arguments:   (1) the theory of fraud

charged in the indictment and explained in the jury instructions was invalid as a matter

of law;   (2) the District Court erred in admitting certain evidence;   (3) the enhancement

of his sentence for "sophisticated means" under the United States Sentencing

Guidelines   § 2F.1.1(b)(5)(c) (1998) violated the *ex post facto* clause; and   (4) the

District Court's restitution order violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

The Third Circuit vacated Syme's False Claims Act conviction on Count 25 of the

superseding indictment and remanded that count for a new trial based only on the

"treatment" theory of fraud.   The Third Circuit also vacated the sentence imposed and

remanded for resentencing with instructions not to apply the "sophisticated means"

enhancement of § 2F1.1(b)(5)(c) of the United States Sentencing Guidelines.   The

Third Circuit affirmed Symes' conviction in all other respects.   *Syme*, 276 F.3d at 159.

6

On May 22, 2002, Judge Farnan re-sentenced Syme to 688 days imprisonment, with credit for time served, followed by 3 years supervised release, and ordered Syme to pay $ 255,000 restitution and $1250 in special assessments.  On July 2, 2002, Judge Farnan granted the Government's motion to dismiss Count 25 of the superseding indictment.   Syme filed a petition for a writ of certiorari, which the United States Supreme Court denied on February 4, 2003.

Thereafter, Syme filed a *pro se* § 2255 motion challenging his 2000 conviction and sentence (D.I. 166.).  The § 2255 motion asserts ten ineffective assistance of counsel claims and one claim that the Government failed to disclose favorable evidence in a timely manner.  The Government filed an answer (D.I. 174.), and Syme filed a reply brief.  (D.I. 177.)

## III.   DISCUSSION

### A. *Brady* claims

The relief sought under 28 U.S.C. § 2255 is reserved for extraordinary circumstances.  *See Brecht v. Abrahamson,* 507 U.S. 619 (1993).  If a petitioner fails to raise a claim on direct appeal, that claim is procedurally defaulted and cannot thereafter be reviewed pursuant to 28 U.S.C. § 2255, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or that he is actually innocent. *Bousley v. United States,* 523 U.S. 614, 616, 621-23 (1998)(citation omitted);  *United States v. Essig,* 10 F.3d 968, 979 (3d Cir. 1993)(citing *United States v. Frady,* 456 U.S. 152, 167-68 (1982)).

7

Syme asserts that his conviction was "obtained by unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant." (D.I. 166, at 6.) Specifically, he contends that: (1) the Government never disclosed during trial that senior executives with Xact pled guilty to criminal charges related to Medicare fraud or the fact that Xact entered a settlement agreement regarding a civil fraud case against it; and (2) the Government's delayed disclosure of two important documents until the second day of trial prevented defense counsel from properly preparing Syme's defense. Syme did not raise either of these claims during trial or on direct appeal. Therefore, I cannot review the merits of these claims unless Syme demonstrates cause for his procedural default and prejudice resulting therefrom, or actual innocence.

To establish cause for his default, Syme must demonstrate that "some objective factor external to the defense impeded counsel's efforts to raise the claim." *United States v. Essig*, 10 F. 3d 968,  979 (3d Cir. 1993)(citation omitted).   Neither Syme's § 2255 motion nor his reply to the Government's answer allege that any external factor prevented him from asserting these claims at trial or on direct appeal. Thus, Syme has failed to demonstrate cause sufficient to excuse his default.

In the absence of cause, I do not need to address the issue of prejudice. *See Smith v. Murray*, 477 U.S. 527, 533 (1986); *Lawrie*, 9 F. Supp. 2d at 453 (D. Del. 1998).   Nevertheless, for the reasons explained below, I conclude that Syme has not demonstrated prejudice because he has not shown "that the errors at his trial . . . worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170.

8

Syme contends that the Government failed to disclose or delayed disclosure of information and documents.  I interpret these claims to allege a violation of *Brady v. Maryland*, 373 U.S. 83(1963).  In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Id.* at 87.  There are three components to a *Brady* violation: (1) the material evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) the [Government] willfully or inadvertently suppressed the evidence; and (3) prejudice ensued.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  The prosecutor's duty to disclose material exculpatory evidence applies even if the accused does not request the evidence.  *Id.* at 280.

First, Syme contends that the Government suppressed the fact that Xact settled a civil fraud suit and that Xact executives pled guilty to criminal charges of fraud.  With respect to the information about Xact's civil settlement, the trial transcript demonstrates that defense counsel was aware of the information and that he was permitted to use the information in an attempt to impeach two Government witnesses who were Xact employees.  (D.I. 174, Exh. 9.)  As for Syme's contention that the Government suppressed information that several Xact executives pled guilty to fraud charges,[2] it appears that only one Xact executive actually pled guilty to fraud charges, namely,

---

[2]In fact, defense counsel did mention in his closing argument the fact that certain Xact executives had been charged with the "very same crimes" alleged in Syme's case. (D.I. 115, at 168.)

Xact's former vice president, and that he did not enter a guilty plea until after the

conclusion of Syme's trial.[3]   (D.I. 174, at 16.)   Thus, because defense counsel was

aware of Xact's settlement, and because the former Xact vice president did not plead

guilty until after Syme's trial, by definition, the Government did not suppress either piece

of information.  Accordingly, Syme's first claim fails to establish a *Brady* violation.

Syme also asserts that the Government violated his constitutional right to a fair

trial by waiting to disclose the following two documents until the second day of trial:  (1) a

1995 memo from HCFA regarding the definition for "home station" contained in section

1302E of the Medicare Carriers Manual; and (2) a handwritten memo from Xact's Vice

President of Provider Relations to Xact's attorney ("Walker-Pennington memo").[4]   The

_____

[3]A Department of Justice Health Care Fraud Report for the Fiscal Year of 1998
states:
   Pennsylvania Blue Shield, the Medicare carrier for several mid-Atlantic states,
resolved a two-year investigation by agreeing to pay $38.5 million in settlement of
allegations that it improperly processed Medicare secondary payor claims, neglected to
recover overpayments, bypassed certain computer payment safeguards, and failed to
implement required screens for certain lab tests, all of which resulted in false claims to
the Medicare program.  The Report also states that, "[i]n a related development, a
former corporate vice president . . . has pleaded guilty" to three charges: conspiring to
submit false information to the HCFA and two charges of making false statements to
HCFA in connection with CPEP audits.
http//www.doj.gov/dag/pubdoc/health98.htm#cases.

[4]During a  pre-trial conference held on October 21, 1998, Judge Farnan ordered
the Government to provide all outstanding discovery by Friday, October 23, 1998.
Although the Government substantially complied with that order, the Government
withheld certain documents as privileged because they were internal agency
memoranda or letters relating to charges filed in a separate federal civil suit against
Syme that had been stayed during the pendency of Syme's federal criminal proceeding,
*United States v. Syme*, Civ. A. No. 97-308-SLR.  On October 26, 1998, the first day of
Syme's criminal trial, defense counsel filed a motion *in limine* requesting Judge Farnan
to conduct an *in camera* review of all the documents to determine if any or all of the
documents should be released to the defendants.  On October 27, 1998 Judge Farnan
ordered the Government to turn over the documents to the defendants, stating:

HCFA memorandum regarding section 3102E states that "[w]e appreciate the effort your staff and the staff of Xact Medicare Services has expended in defining Home Station for ambulance services.  Your proposed definition is in line with our interpretation of Home Station and we will keep that definition in mind as we refine policies in this area. . . . The jurisdiction policy forth in section 3102E of the Medicare Carriers Manual <u>only</u> determines which carrier will process a given claim." (emphasis contained in original) (D.I. 166, Attachment.)  As for the Walker-Pennington memorandum, it sets forth the following questions posed by an Xact executive, and answers provided by an Xact attorney:

1.  How firm is our position on Home Station as the basis of payment?
2.  Is the 3/27/95 Doddridge letter[5] sufficient notice of correction of our policy?

_____

At the crux of the government's case is the question of billing by defendants on the basis of a home station, or home site, or garage site.

Now, the defendants are charged with crimes, and the time frames I see in these discussion are 1996, mostly.  The government is pursuing these defendants on the basis of its regulation of how billing can occur and that it can only occur, in the government's interpretation, if there is a home station in a particular jurisdiction and you can bill that jurisdiction's rate.

While that is the government's premise of the case, there are documents that exist that indicate that the government may not have had a firm policy on what home station was.  These documents are up for interpretation. . . . As I read these documents  - - I hope I am not misreading them  - - it seems they may be at least of assistance to the defendants in challenging the very heart of the government's case, home station, at a time when they are being charged criminally for violating the regulation.  (D.I. 110, at B-6 - B-7.)

The HCFA memorandum and the Walker-Pennington memorandum were two of the documents disclosed at that time.

[5]The March 27, 1995 Doddridge letter originated from Xact and addressed Ambulance Suppliers.  The letter states:

The Health Care Financing Administration has confirmed the definition of home station as being "the location of the garage or the place where the ambulance vehicle is housed and from where it routinely departs for patient pick up.

A: Probably so, but is it really consistent w/HFCA CO policy.
3.  It appears to me that HCFA really is not backing our Home Station position.
    They differentiate between carrier [] jurisdiction and jurisdiction for
determining the charge."
        A: Agreed, so we should follow HFCA.

(Attached to D.I. 166.)

It is well-settled that the *Brady* rule only applies to the prosecution's complete

failure to disclose exculpatory evidence - - evidence that is both favorable to the

accused and material either to guilt or innocence. *United States v. Higgs*, 713 F.2d 39,

43-4 (3d Cir. 1983).  When, as here, the issue involves a delayed disclosure of

evidence, there is no due process violation under *Brady* if the "exculpatory evidence can

be effectively presented at trial and the defendant is not prevented by lack of time to

make needed investigation."  *Id.*

Applying the foregoing principle to Syme's claim about the Government's delayed

disclosure of the two memoranda, I conclude that Syme has failed to establish a *Brady*

violation.  First, the two documents in question were not clearly exculpatory.  Even

though Judge Farnan ordered the Government to disclose these documents, he

explained that the references contained therein actually cut both ways – "[s]ome are

negative for the defendants, and some are possibly of some advantage, because [the

documents] indicate[] that there was this discussion going on about what a home station

was." (D.I. 110, at B-5.)   Syme was not a party to these two internal agency

memoranda, therefore, the fact that HCFA and Xact employees and executives were

---

The reimbursement for an ambulance service is based upon the location of the
home station of the transporting vehicle.
Defendant's Exhibit 6.

uncertain about the definition for the term "home station" does not directly relate to the underlying issue of Syme's intent to defraud.[6]

Nevertheless, even if the two documents meet the definition of exculpatory evidence, their delayed disclosure does not rise to the level of a *Brady* violation because Syme did not suffer any prejudice resulting from the delay.  Syme's basic argument is that the confusion over the term "home station" was a red herring, and that the "central issue" was the fact that no specific Medicare/Medicaid regulation prohibited his act of billing at the higher Pennsylvania rate.  Yet, because the two documents provided by Syme only specifically mention the term "home station" and do not mention the absence of a regulation, I fail to see how their delayed disclosure prevented defense counsel from investigating what Syme calls the "central issue."

Moreover, even if Syme is arguing that the delayed disclosure of the two memoranda prevented defense counsel from demonstrating the confusion over the term "home station" that existed during the relevant time period, his argument fails.  The transcript reveals that defense counsel effectively demonstrated the existing confusion over the term "home station" when he cross-examined the Government's witness, Shaffer.  For example, counsel asked Shaffer if the Medicare Carriers Manual distributed by HCFA defined "home station so that the Symes of the world can look at it and say, as long as it is a home station, now I am okay?" Shaffer answered "No, they do not."  (D.I. 110, at B-135-136)   Counsel also had Shaffer read the following definition for carrier

---

[6]Moreover, as explained *infra* at 17-18 , the absence of a specific regulation during the relevant time period was immaterial to the legal issue as to whether Syme was involved in a scheme to defraud.

13

jurisdiction contained in the Ambulance Reference Manual[7] that was distributed by the

American Ambulance Association:

> If only one ambulance is used to transport the patient from the point of initial
> pickup to the final destination, then the jurisdiction lies with the carrier serving the
> point of origin. **The Medicare manual defines the point of origin as being the**
> **home station.**

*Id*. at B-135 (emphasis added).  Counsel asked Shaffer to read the following explanatory

note regarding carrier jurisdiction that was contained in the Ambulance Reference

Manual:

> The American Ambulance Association is in the process of obtaining clarification
> from HCFA concerning jurisdiction due to inconsistencies in current law. **For**
> **example, the point of origin is not necessarily the home station of the**
> **vehicle**. Thus, carriers currently sitting on carrier borders have received different
> instructions from carriers and from HCFA.

*Id.* at B-136 (emphasis added).  Counsel then pointed out that the Ambulance

Reference Manual was the Government's exhibit, and noted that the statements

contained therein were inconsistent and could easily cause confusion.  (D.I. 110, at B-

138.)

Counsel also referred to certain Medicare Reports prepared by Xact during the

relevant time period that explained certain changes to the guidelines as reported by

HCFA.  (D.I. 110, at B-140 to B-143)  Counsel asked Shaffer if the reports discussed

changes regarding the definition for "home station" prior to 1996, and Shaffer responded

---

[7]HCFA prepared and distributed the Medicare Carriers Manual, but a second and
different manual, the Medicare Reference Manual, was prepared by an attorney on
behalf of the American Ambulance Association and distributed by that association.  (D.I.
110, at B-99, B-101 through B-104.)  The Medicare Reference Manual contained the
attorney's interpretation of the Medicare rules and regulations applicable to ambulance
suppliers, and it also contained copies of pages taken from the Medicare Carriers
Manual.

14

negatively. *Id*. Finally, counsel introduced into evidence "Medicare Part B Reference

Manual", written and distributed by Xact in June 1996, and had Shaffer read the

following definition for home station contained therein: "the location of the garage or the

place where the ambulance vehicle is housed and from where it routinely departs for

patient pick-up." (D.I. 110, at B-143 to B-144.)   Counsel underscored the fact that this

definition of "home station" was handed down in 1996.

Moreover, during his closing argument, counsel actually did refer to the Walker-

Pennington memorandum, explaining:

> this is an internal memorandum of Xact.  I'm assuming that Steve is Steve
> Walker, who it's addressed to, who was the lawyer for Xact, as testified by Mr.
> Kennedy, and I'm assuming that Phil is none other that Phil Pennington, the Vice
> President or whatever he said it was.
>
> [Quoting from the memo:] It appears to me HCFA really is not backing our home
> station position.  They differentiate between carrier processing jurisdiction and
> jurisdiction for determining the charge.
>
> Agreed. [End of quote]  This is the attorney for Xact saying to another function of
> Xact, you haven't been applying the rules properly.
>
> How in the world can any Government expect to prosecute the citizen when the
> rules have not been properly drafted, created, communicated, and applied fairly
> and uniformly?

(D.I. 115, at 196.)

In short, Syme has failed to demonstrate that the delayed disclosure of the two

memoranda prevented counsel from effectively establishing the confusion over how to

determine an ambulance's "home station" for billing claims submitted during the relevant

time period.  Thus, because Syme's *Brady* claims are meritless, he has not

demonstrated sufficient prejudice to excuse his default.

15

**B.     Ineffective assistance of counsel claims**

A federal prisoner may properly raise in a § 2255 motion a claim alleging

ineffective assistance of counsel. *Massaro v. United States*, 538 U.S. 500, 504 (2003).

Federal courts must review ineffective assistance of counsel claims under the two-

pronged test articulated in *Strickland v. Washington,* 466 U.S. 668 (1984).  Pursuant to

*Strickland*'s first prong, the petitioner must demonstrate that "counsel's representation

fell below an objective standard of reasonableness," with reasonableness being judged

under professional norms prevailing at the time counsel rendered assistance.

*Strickland*, 466 U.S. at 688.  Under the second prong, the petitioner must demonstrate

"there is a reasonable probability that, but for counsel's error the result would have been

different."  *Id.* at 687-96.  A reasonable probability is a "probability sufficient to

undermine confidence in the outcome." *Id.* at 688.  When applying the *Strickland* test, I

must indulge in a strong presumption that counsel's conduct falls within the wide range

of reasonable professional assistance. *Id*. at 688-89.

         1.  Claims One through Seven

Syme's § 2255 motion asserts a total of ten ineffective assistance of counsel

claims.  The following seven claims are based on what Syme calls the "central issue,"

namely, that he could not be guilty under the "Pennsylvania rate theory" because there

was no prevailing Medicare/Medicaid regulation for determining rate reimbursement

during the relevant time-period:  (1) defense counsel failed to file a pre-trial motion

raising the fact that the Medicare regulations did not define "home station";  (2) defense

counsel failed to comprehend the significance of two items that were turned over by the

16

Government, namely, the HCFA memorandum about § 3102E's definition for "home

station" and the handwritten Walker-Pennington memorandum;  (3) defense counsel did

not challenge the Government's assertion that § 3102E of the Medicare Manual

provided the applicable regulation;  (4) defense counsel did not underscore the

importance of a Government witness' testimony that "no regulation on the issue of

payment locality existed until December 1995";  (5) defense counsel never filed a motion

for dismissal alleging that there was no controlling regulation;  (6) defense counsel failed

to argue the lack of any governing regulation; and  (7) defense counsel failed to file a

post-trial motion raising the argument that there was no relevant regulation at the time in

question.  In short, Syme argues that defense counsel wasted his time and resources in

arguing that there was no definition for the term "home station" when he should have

argued that Syme did not violate any existing regulation.

On direct appeal, the Third Circuit held that, "even if there was no HCFA

regulation or written instruction from Xact on the definition of 'home station,' and no clear

indication that 'home station' was the appropriate standard for reimbursement, the

prosecution could still have demonstrated that Syme knew that this was the standard

that Xact wanted ambulance companies to apply and that he knowingly used a

Pennsylvania provider number in order to get paid at a higher rate." *Syme*, 276 F.3d at

146-47.  According to the Third Circuit, the legal issue at trial was whether there was a

scheme to defraud, not whether a regulation defining "home station" existed during the

relevant time period.  *Id*. at 147.

The Third Circuit's holding demonstrates that counsel did not perform deficiently

by failing to argue the absence of a governing regulation, and that Syme was not

prejudiced by counsel's failure to raise that argument.  Accordingly, I conclude that claims one through seven do not warrant federal habeas relief.

Additionally, claims two, five and seven fail to warrant relief because the record belies some, if not all, of the allegations raised therein.  In claim two, Syme contends that counsel failed to comprehend the significance of the HCFA memo and the Walker-Pennington memo.  However, Syme's argument with respect to the Walker-Pennington memorandum is factually baseless, because defense counsel specifically referred to the Walker-Pennington memorandum in his closing argument. (D.I. 115, at 195-96.)  In claims five and seven, Syme complains that counsel did not file a motion to dismiss based on the absence of any controlling regulation, and that counsel failed to properly raise the lack of any governing regulation as an issue in a post-trial motion.  However, after the jury rendered its verdict, counsel filed a motion for directed verdict of acquittal, arguing that all counts of the indictment (except Count 31) should be acquitted because "the Indictment in this case was premised upon policy statements that do not have the effect of federal law."  (D.I. 52.)  Judge Farnan denied the motion for directed verdict, holding that Syme was indicted and convicted pursuant to the clearly established law set forth in the mail fraud statute, the wire fraud statute, and the False Claims Act; the scheme to defraud and  false or fraudulent claims did not need to violate federal law in order to be prosecutable under those statutes and Act.  *United States v. Syme*, 43 F. Supp. 2d 499, 500 (D. Del. 1999), *affirmed in part, vacated in part, by United States v. Syme*, 276 F.3d 131 (3d Cir. 2002).

18

### 2. Claim Eight

The first twenty-nine counts of the superseding indictment charged Syme with submitting claims for ambulance services to Medicare and/or to Medicaid that were false and/or fraudulent under the wire fraud statute, the mail fraud statute, and the Fraudulent Claims Act.  As noted earlier, each of those charges was based on at least one of four theories:  (1) the claims were submitted for payment at the higher Pennsylvania rate of reimbursement when they should have been submitted for reimbursement at either the Delaware or Maryland rate;  (2) the claims were for ambulance trips that were not medically necessary;  (3) the claims were for services or for trips to destinations that were not covered by Medicare or Medicaid; and/or  (4) duplicate claims were submitted under different company names for the same service.  (D.I. 174, at Exh. 1.)   While deliberating, the jury submitted a note to Judge Farnan asking for guidance as to whether or not the jury had to conclude that all four possible theories were proven. Judge Farnan answered that the jury did not have to find all four theories satisfied in order to convict.  The jury convicted Syme on Counts 1-17, 19, 21, 23-25, 27, 29, and 30.

In his eighth ineffective assistance of counsel claim, Syme asserts that counsel performed deficiently by failing to request a specific unanimity instruction.  However, the record reveals that Judge Farnan would have denied such a request as unnecessary. For example, at the close of Syme's trial, defense counsel filed a motion for new trial stating that, "in retrospect, [counsel] should have brought to the Court's attention the fact that the lack of unanimity instruction coupled with the Court's response to the note compromised the Due Process rights of the defendants to a fair trial."  (D.I. 53)   Judge

19

Farnan denied the motion after specifically concluding that the case did not "necessitate

a specific unanimity instruction." *Medical Services Corp., Inc.*, 43 F. Supp. 2d  499, 504

(D. Del. 1999) *affirmed in part, vacated in part by United States v. Syme*, 276 F.3d 131

(3d Cir. 2002).  Thus, the instant claim does not warrant relief because Syme has failed

to demonstrate the requisite prejudice under *Strickland*.

      3.  <u>Claim Nine</u>

In claim nine, Syme contends that counsel provided ineffective assistance by

advising Syme that he should not testify.   According to Syme, his testimony would have

raised the fact that no regulation prohibited him from billing at the higher Pennsylvania

rate.  (D.I. 166, at 6.)

A criminal defendant has a constitutional right to testify in his own behalf, but

defense counsel's alleged failure to call the defendant to the stand does not constitute

ineffective assistance when a defendant is aware of his right to testify.  *Rock v.*

*Arkansas*, 483 U.S. 44, 53 n. 10 (1987)*;  United States v. Smith*, 235 F. Supp. 2d 418,

424 (E.D. Pa. 2002).  Here, Syme does not contend that he was unaware of his right to

testify.  In fact, it appears that Syme knew about his right to testify because

defense counsel's opening statement mentioned the fact that Syme was going to testify

later on in the trial.

Moreover, at some point during Syme's trial, the Government learned that Syme

had been fired from his job at the Lower Merion Police Department for falsifying a police

report.  The Government informed defense counsel that it intended to use this

information during cross-examination if Syme took the stand.  After learning about the

Government's plan, defense counsel informed the Court in a sealed ex-parte letter that

"[over] the weekend, developments have occurred which include the fact that the defendant will not testify and, obviously, will not call character witnesses." (D.I. 44; D.I. 174, at 12.)

The Government argues that the information about Syme's prior falsification was likely to have a negative impact on the jury's perception of Syme because it demonstrated dishonesty. I agree, especially because the charges against Syme also involved an element of dishonesty. Therefore, Syme has failed to satisfy the first prong of the *Strickland* test because counsel's decision to not call Syme to testify was an objectively reasonable strategic decision.

Additionally, the Third Circuit held that the Government could establish the elements of the crimes charged whether or not a regulation existed during the specific time period. Therefore, Syme was not prejudiced by his failure to testify about the absence of a governing regulation, and claim nine fails to warrant relief.

4. <u>Claim Ten</u>

In his final ineffective assistance of counsel claim, Syme contends that counsel should have objected at sentencing to the enhancement for "sophisticated means." However, any prejudice stemming from this failure was cured when Judge Farnan re-sentenced Syme without considering the "sophisticated means" enhancement. Therefore, I will deny this claim as moot because Syme has already obtained the relief requested.

## IV.   EVIDENTIARY HEARING

A district court is required to hold an evidentiary hearing on a § 2255 motion "unless the motion and the files and records of the case conclusively show that the

21

petitioner is entitled to no relief."  28 U.S.C. § 2255;  *see also United States v. Booth*,

432 F.3d 542, 545-46 (3d Cir. 2005);  *United States v. McCoy,* 410 F.3d 124, 131 (3d

Cir. 2005);  Rule 8(a) of the Rules Governing Section 2255 Proceedings, 28 U.S.C. foll.

§ 2255.  As previously explained, the record conclusively demonstrates that Syme is not

entitled to relief.  Thus, an evidentiary hearing is not required.

## V.    CERTIFICATE OF APPEALABILITY

Finally, I must determine whether a certificate of appealability should issue.  *See*

Third Circuit Local Appellate Rule 22.2.  A certificate of appealability is appropriate only

if the petitioner "has made a substantial showing of the denial of a constitutional right."

28 U.S.C. § 2253(c)(2).  The petitioner must "demonstrate that reasonable jurists would

find the district court's assessment of the constitutional claims debatable or wrong."

*Slack v. McDaniel,* 529 U.S. 473, 484 (2000).  Additionally, when a court denies a

habeas petition on procedural grounds without reaching the underlying constitutional

claims, the petitioner  must demonstrate that reasonable jurists would find it debatable:

(1) wether the petition states a valid claim of the denial of a constitutional right; and (2)

whether the court was correct in its procedural ruling.  *Slack v. McDaniel,* 529 U.S. 473,

484 (2000).  If the district court correctly invokes a plain procedural bar to dispose of a

case, "a reasonable jurist could not conclude either that the district court erred in

dismissing the petition or that the petitioner should be allowed to proceed further."  *Id.*

I have determined that Syme's § 2255 motion to vacate must dismissed because

Syme's claims are either procedurally barred or meritless.  I am persuaded that

reasonable jurists would not find my assessments debatable.  Therefore, Syme has

failed to make a substantial showing of the denial of a constitutional right, and I will not issue a certificate of appealability.

## VI.   CONCLUSION

For the reasons stated, Syme's 28 U.S.C. § 2255 motion to vacate, set aside, or correct sentence is dismissed.  An appropriate order shall issue.